**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| XPO LOGISTICS, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| BEST DEDICATED SOLUTIONS, LLC, an Illinois limited liability company, and ROBERT BILCOX, KAREN CULVER, PATRICK GOOD, JENNIFER GREENHILL, WILLIAM PARKE, SAMTWAN THOMAS, and DANIEL VESTAL, individually, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

XPO Logistics, Inc. ("XPO"), by its undersigned counsel and for its Complaint against Defendants Best Dedicated Solutions, LLC ("BDS"), Robert Bilcox ("Bilcox"), Karen Culver ("Culver"), Patrick Good ("Good"), Jennifer Greenhill ("Greenhill"), William Parke ("Parke"), Samtwan Thomas ("Thomas"), and Daniel Vestal ("Vestal," along with Bilcox, Culver, Good, Greenhill, Parke, and Thomas, the "Individual Defendants" and, along with BDS, the "Defendants") states as follows:

**Nature of the Case**

1.     XPO brings this suit against BDS as a result of BDS's improper scheme to build its business by raiding XPO's employees and misusing the proprietary and trade secret information they possess, all in violation of law, rather than through fair competition. XPO brings this suit against the Individual Defendants – seven former XPO employees – for participating in BDS's scheme in violation of those former employees' employment agreements

with XPO and other applicable law. BDS and the Individual Defendants have violated the law in connection with BDS's hiring of, and conduct engaged in by, the Individual Defendants, all of whom are bound by contractual restrictions against competing with XPO, soliciting XPO's customers and/or employees, and disclosing XPO's confidential information.

2.      XPO has spent substantial time, effort, and resources in developing its customer base and carrier networks, workforce, and confidential and proprietary technology and information. The Individual Defendants, through the course of their XPO employment, became privy to XPO's confidential information and trade secrets, and possess proprietary information about, and had direct contact with, XPO's customers, carriers, vendors, suppliers, employees, and independent contractors.

3.      In order to protect XPO's valuable confidential and proprietary information, and to protect itself from unfair business practices, XPO requires its employees sign employment agreements. The agreements between XPO and the Individual Defendants are referred to as the "Employment Agreements" and are described below in greater detail.

4.      On January 7, 2016, XPO terminated the employment of Bilcox and three other XPO employees who worked under his direction – Thomas, Greenhill, and Vestal – after an internal investigation revealed that all had engaged in wrongful workplace conduct.

5.      Following the termination of his XPO employment, BDS hired Bilcox to serve as BDS's Managing Director of Strategic Accounts. Together, BDS and Bilcox have reassembled a team of employees whom Bilcox managed at XPO and about whom Bilcox otherwise had information. Bilcox and those other former XPO employees have proceeded to solicit XPO customers that the Individual Defendants had serviced and to use carriers developed as part of

XPO's network, all by utilizing XPO's confidential and proprietary information to unfairly compete against XPO.

6.     BDS, with Bilcox's assistance, hired and continues to employ the other Individual Defendants in violation of the post-employment obligations contained in their respective Employment Agreements, including non-competition, customer and/or carrier non-solicitation, employee non-solicitation, and confidentiality provisions.

7.     The seven Individual Defendants represented a significant percentage of the total number of employees at XPO's Lake Forest location.  By hiring en masse the Individual Defendants, BDS has engaged in an improper effort to develop its own business by misappropriating the customer goodwill, carrier relationships, and knowledge of confidential and proprietary information the Individual Defendants acquired through their employment with XPO.

8.     BDS's brazen and systematic poaching of XPO's former employees constitutes tortious interference with XPO's contractual relations with its former employees, the misappropriation of XPO's trade secrets and confidential information, and unfair competition.

9.     Furthermore, each Individual Defendant induced and conspired with BDS and other of the Individual Defendants to breach his or her post-employment obligations to XPO and to misappropriate XPO's trade secrets.

10.     If Defendants' misconduct, including without limitation contractual breaches, tortious interference, the actual or threatened misappropriation of trade secrets, and unfair competition, is permitted to continue, all for the benefit BDS and to the detriment of XPO, BDS – a direct XPO competitor – will succeed in improperly appropriating XPO's goodwill and competing unfairly and without investment of the significant time and money that XPO has made

in developing its customer and carrier relationships, its skilled and stable workforce, and its business strategies.

11.    Irreparable harm will result to XPO from BDS's systematic raiding of XPO's employees as well as from the Individual Defendants' continuous violation of their respective Employment Agreements.  As such, XPO requires injunctive relief to protect itself from such grave commercial misconduct.

12.    XPO also seeks all damages resulting from Defendants' past misconduct.

**Parties and Related Individuals**

13.    Plaintiff XPO is a Delaware corporation with its principal place of business in Greenwich, Connecticut.

14.    XPO, itself and through its wholly owned subsidiaries, is a logistics provider that efficiently and effectively provides global transportation solutions for all types of freight throughout the contiguous United States.  XPO is the second largest fright broker in the world.  XPO operates a freight brokerage location in Bannockburn, Illinois.  (Based on the site of its prior long-time offices in neighboring Lake Forest, this is known as XPO's Lake Forest location.)

15.    Defendant BDS is a limited liability company organized under the laws of the state of Illinois with its principal place of business in Libertyville, Illinois.  Upon information and belief, the member(s) of BDS are citizens of the state of Illinois.

16.    BDS is a provider of fright brokerage and logistics services and competes with XPO.

17.    On information and belief, each of the Individual Defendants is an individual residing in the state of Illinois.

4

18.     Prior to becoming employed with BDS, each of the Individual Defendants was employed by XPO at its Lake Forest location.

19.     Bilcox was employed by XPO as a Senior Account Executive from February 22, 2013, the date on which XPO acquired his prior employer, to January 7, 2016.

20.     Culver was employed by XPO as an Account Manager from February 22, 2013 to November 4, 2016.

21.     Good was employed by XPO as an Account Executive from April 15, 2013 to September 12, 2016.

22.     Greenhill was employed by XPO as an Account Manager from February 22, 2013 to January 7, 2016.

23.     Parke was employed by XPO as a Senior Carrier Procurement Representative from February 22, 2013 to March 11, 2016.

24.     Thomas was employed by XPO as a Carrier Sales Representative from May 14, 2014 to January 7, 2016.

25.     Vestal was employed by XPO as a Carrier Procurement Representative from March 31, 2014 to January 7, 2016.

26.     Each of the Individual Defendants presently is employed by BDS in Libertyville, Illinois.

## Jurisdiction and Venue

27.     This Court has subject matter jurisdiction over this action.  XPO's claims in this action raise a federal question under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq*.  The Court has supplemental jurisdiction over XPO's other claims pursuant to 28 U.S.C. § 1367.  In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 as, on information

and belief, there is complete diversity of citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

28.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because this is a judicial district in which at least one of Defendants resides, and the remaining Individual Defendants are domiciled in Illinois.  Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(1) because BDS does business in the district.

29.     Venue also is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to XPO's claims has occurred.

<u>**Factual Allegations**</u>

**I.     XPO's Business**

30.     XPO is a global transportation and logistics company that provides comprehensive supply chain solutions to its customers.

31.     XPO offers its customers a compelling range of transportation solutions, including freight brokerage, last mile, supply chain, expedited shipping, less-than-truckload, full truckload, managed transportation, and global forwarding services.  XPO is the second largest freight brokerage provider in the world

32.     XPO serves its customers in the freight brokerage business by using a network of relationships with carriers to provide the best transportation solutions for each customer.  XPO also relies on proprietary software and technology to provide efficient solutions to its customers.

33.     XPO gains a competitive advantage in part by matching – in a tailored, efficient, and cost-effective manner – the size, weight, and location of the freight with the right mode of transport, capacity, and carrier to serve the specific needs of each of its customers.

34. XPO invests heavily in its workforce and technology in order to meet the specific needs and requirements of its customers and also to provide its customers with the stability and peace of mind that comes with knowing that their logistics needs will be met under all circumstances.

35. XPO's continuing success also is based in significant part upon its strong customer and carrier relationships – relationships that have been developed and forged by substantial investment in identifying and cultivating personal relationships with the management personnel of customers who are responsible for freight shipping and logistics and learning, compiling, preserving in an efficient and readily accessible fashion, and acting on those customers' specific requirements, preferences, and goals to allow XPO to deliver market leading service.

36. XPO's continuing success also is based in significant part upon strong relationships that it has developed with the carriers that it utilizes to meet its customers' needs. These carrier relationships have been developed through extensive time and effort in learning information about the carrier management personnel responsible for scheduling carrier loads and routing.

37. XPO also has developed, through extensive time and effort, a deep knowledge of the carriers it works with and the routes and lanes they service, their capabilities, strengths and weaknesses, and each carrier's specialties. This knowledge enables XPO to match the correct carrier with the particular customer or freight order to serve XPO's customers in the most efficient manner possible.

38. XPO has developed and implemented at great expense a proprietary software platform called Freight Optimizer that allows the collection, organization, and targeted

deployment and use of the enormous amount of proprietary information, including the categories referenced above, that XPO has created about its customers and carriers in order to provide XPO with a competitive advantage. Freight Optimizer allows XPO's employees, like the Individual Defendants, to access and use historical and targeting data regarding XPO's customers and potential customers including, but not limited to, detailed customer contact information and history, billing terms, billing locations, truck capacity information, signed brokerage contracts, and other policy agreements. Freight Optimizer similarly contains a wealth of historical and targeting data regarding XPO's carrier force including, but not limited to, all carrier history, pricing data, lane history, insurance policies, compliance documents, and safety ratings. By applying proprietary algorithms to this historic data, Freight Optimizer enables XPO's employees, like the Individual Defendants, to use all of this collected, analyzed and organized information about both XPO's customers and carriers to efficiently match brokered loads between customers and carriers.

39. Freight Optimizer only is accessible to those employees whose jobs require them to have access to it and that access is restricted to use within XPO's facilities or by utilizing a virtual private network (VPN), equipped with robust security protocols, from an XPO-owned laptop, and by logging in with an XPO provided employee profile that matches employee access right to their particular job and responsibilities.

## II.     The Individual Defendants' Employment Agreements

40. Each of the Individual Defendants was employed by XPO at its Lake Forest location.

41. Based on the opportunities and training the Individual Defendants were provided by XPO, the Individual Defendants gained knowledge of XPO's customer relationships and carrier operations.

42.     That knowledge includes confidential information relating both to XPO's customer services and its relationships with carriers, which XPO uses to provide its customers with the best available shipping solutions.

43.     Through their XPO-granted access to the Freight Optimizer software, the Individual Defendants were able to access substantial quantities of data regarding XPO's customers and carriers.

44.     XPO understands the damage that can be done by unfair competition by its former employees.  To prevent this, XPO required the Individual Defendants to each execute an Employment Agreement containing reasonable and limited restrictions prohibiting each of them from improperly or unfairly competing with XPO, soliciting XPO's customers or employees, or disclosing XPO's confidential information.

45.     The Individual Defendants each signed one of three different versions of the Employment Agreement.

46.     On December 3, 2013, March 31, 2014, and May 14, 2014 respectively, Bilcox, Vestal, and Thomas each executed an Employment Agreement with XPO.  This form of the Employment Agreement is referred to as the "BVT Agreement" and Bilcox's, Vestal's, and Thomas's signed Employment Agreements are attached as **Exhibits 1, 2, and 3,** respectively.

47.     On February 21, 2013, February 22, 2013, and February 22, 2013 respectively, after the acquisition by XPO of Covered Logistics & Transportation LLC where they each had been employed, Culver, Greenhill (then known as Jennifer Koffler), and Parke each executed an Employee Confidentiality, Non-Solicitation & Non-Competition Agreement.  This form of the Employment Agreement is referred to as the "CGP Agreement" and Culver's, Greenhill's, and Parke's signed Employment Agreements are attached as **Exhibits 4, 5, and 6**, respectively.

48.     On April 8, 2013, Good executed an Employee Confidentiality, Non-Solicitation & Non-Competition Agreement.  Good's Employment Agreement is referred to as the "Good Agreement" and a signed copy is attached as **Exhibit 7**.

### III.     The BVT Agreement

49.     The BVT Agreement contains numerous terms specifically intended to protect XPO's customer relationships and information, information technology, training programs, business plans, and other confidential or proprietary information to which Bilcox, Vestal, and Thomas were granted access in order to perform the responsibilities of their jobs.

50.     The BVT Agreement includes a covenant in which the employees agree, for a period of six months following the end of their employment, not to compete with XPO. Specifically, the employees agree not to:

> (i) perform any services, whether as an employee, agent or independent contractor, which are the same as or reasonably related to the services you performed while employed by [XPO] during the last two years of your employment with [XPO], for a "***Competing Business***"(defined below); (ii) own any financial interest in a Competing Business (e.g., as a partner, member, principal , shareholder or other owner (other than a holder of less than 1% of the outstanding voting shares of any publicly held company)); or (iii) loan money to, borrow money from, lease to, or have any other financial dealings with a Competing Business (except for ownership of less than 1% of the outstanding voting shares of any publicly held company). (**Exhibits 1, 2, and 3**, ¶ 7(b)(i)-(iii); emphasis in original).

51.     Competing business is defined in the BVT Agreement to mean:

> any individual or business (e.g., a corporation, partnership or limited liability company) engaged in our business . . . including by way of example:

> (i) any providers of third-party logistics services, including only by way of illustration, freight brokerage, freight forwarding, expediting, internet load boards, last-mile delivery logistics or intermodal providers, or firms such as CH Robinson, Coyote Logistics, Expeditors International of Washington, Inc., Echo Global Logistics Inc., Total Quality Logistics, Roadrunner Transportation Systems, TransCore. Internet Truckstop LLC and Hub Group

Inc.; and (ii) an individual or business that otherwise competes with our business anywhere i n the Restricted Territory. (**Exhibits 1, 2, and 3**, ¶ 7(c)).

52.     In addition, under the BVT Agreement, for two years following the end of their employment with XPO, the employees agree not to solicit, directly or indirectly, customers and carriers on whose account the employees worked and/or about which they had access to confidential information, in either instance within the last year of the employees' employment with XPO.  Specifically, Bilcox, Vestal, and Thomas agree not to:

> call on, contact, solicit or otherwise take away or disrupt, or attempt to call on, contact, solicit or otherwise take away or disrupt, [XPO's] relationship with or business expectancy from any of [XPO's] customers or carriers (i) on whose account you worked or with whom you had regular contact, or (ii) as to whom you had access to Confidential Information (in either instance at any time within the last one (1) year of your employment with [XPO]). This undertaking on your part for [XPO's] benefit is called your "***Non-Solicit Covenant***." (**Exhibits 1, 2, and 3**, ¶ 6(a); emphasis in original).

53.     Furthermore, under the BVT Agreement, for two years following the end of their employment with XPO, the employees agree not to solicit for employment or hire any other person employed or providing services to XPO.  Specifically, Bilcox, Vestal, and Thomas agree not to:

> hire or interfere (or try to hire or interfere) in any way with (or help any other person or party to (or to try to) hire or in any way to interfere with) [XPO's] relationship with (i) any of [XPO's] employees, (ii) any of [XPO's] i ndependent contractors (iii) any employee of a third party that has an "independent participant" relationship with [XPO] and (iv) any person who at any time during the six (6) months prior to such hiring or interference was described by clauses (i), (ii) or (iii) of this paragraph. This undertaking on your part for [XPO's] benefit is called your "***Anti-Hiring Covenant***." (**Exhibits 1, 2, and 3**, ¶ 5; emphasis in original).

54.     The BVT Agreement also contains a "Confidentiality Covenant" provision, stating:

> You agree to use our Confidential Information only for [XPO's] benefit. You agree that other than as required by you to perform your duties for [XPO], you

will not, at any time, directly or indirectly use, disclose or copy [XPO's] Confidential Information or assist any other person or entity to do so. (**Exhibits 1, 2, and 3**, ¶ 5).

55.     Confidential information is defined to include:

all information, written (whether generated or stored on magnetic, digital, photographic or other media) or oral, not generally known, or proprietary to [XPO] about [XPO's] businesses, affairs, operations, products, services, customer and carrier lists, pricing strategies, operating processes, business methods and procedures, information technology and information-gathering techniques and methods, business plans, financial affairs, and all other accumulated data, listings, or similar recorded matter useful in the businesses of [XPO] . . . (**Exhibits 1, 2, and 3**, ¶ 19).

56.     With respect to the BVT Agreement, Bilcox, Vestal, and Thomas also agree that:

(iii) . . . injunctive relief would be the most practical and efficient remedy for us in the event of your breach; and (iv) agree that [XPO], without having to post bond or prove a lack of an adequate remedy at law, shall be entitled to injunctive relief against any breach by you of a restrictive covenant . . . (**Exhibits 1, 2, and 3**, ¶ 18(iii)-(iv).

### IV.     The CGP Agreement

57.     The CGP Agreement contains numerous terms specifically intended to protect XPO's customer relationships and information, information technology, training programs, business plans, and other confidential or proprietary information to which Culver, Greenhill, and Parke were granted access in order to perform the responsibilities of their jobs.

58.     The CGP Agreement includes a covenant by which the employees agree, for a period of six months following the end of their employment, among other things, not to become employed by, engage in business with, serve as an agent to, or perform services to an entity:

(i) that engages in or may engage in the Business, including, without limitation, any providers of third-party logistics services, including, without limitation, freight brokerage, freight forwarding, expediting, internet load boards or intermodal providers, or firms such as CH Robinson, Expeditors International of Washington, Inc., Echo Global Logistics Inc., Roadrunner Transportation Systems, TransCore, Internet Truckstop LLC and Hub Group Inc., (ii) that engages in or may engage in acquisition-related or mergers and acquisition activities related to the transportation or third-party logistics industry, including, without limitation, researching, analyzing and evaluating companies for possible

investment in or acquisition of, for itself or clients, or (iii) that otherwise competes with [XPO] anywhere in which [XPO] engages in or intends to engage in the Business or where [XPO's] customers are located. (**Exhibits 4, 5, and 6, ¶ 4(d)**).

59.     In addition, under the CGP Agreement, for two years following the end of their employment with XPO, the employees agree not to solicit, directly or indirectly, customers or prospective customers with whom the employee signatories had direct contact and/or access to confidential information.  Specifically, Culver, Greenhill, and Parke agree not to:

> call on or attempt to call on, contact or attempt to contact, solicit or attempt to solicit, assist in the solicitation of or attempt to assist in the solicitation of, take away or attempt to take away, or otherwise disrupt [XPO's] relationship with or business expectancy with: (i) any customer of the [XPO] with whom Employee had direct contract on behalf of [XPO] and/or for whom Employee had access to Confidential Information during Employee's employment at [XPO], and who was a customer of [XPO's] at any time during the twelve-month period immediately preceding the termination of Employee's employment with [XPO]; and (ii) any prospective customer of [XPO's] with whom Employee had direct contract on behalf of [XPO] and/or for whom Employee had access to Confidential Information at any time during the six-month period immediately preceding the termination of Employee's employment with [XPO]. (**Exhibits 4, 5, and 6, ¶ 2(a)**).

60.     Furthermore, under the CGP Agreement, for two years following the end of their employment with XPO, the employees agree not to solicit for employment or hire any other person employed or providing services to XPO.  Specifically, Culver, Greenhill, and Parke agree not to:

> (i) solicit for employment or hire or assist any other person or entity in soliciting for employment or hiring any employee of [XPO], any independent contractor providing services to [XPO] or any employee of a company that has an "independent participant" relationship with [XPO] (collectively, "Restricted Persons") to perform services for any entity (other than [XPO]), (ii) attempt to induce any such Restricted Person to leave his or her employment or otherwise interfere with the existing relationship between [XPO] and the Restricted Persons, or (iii) solicit for employment, hire or engage on behalf of himself or any other person any person who was a Restricted Person at any time during the twelve-month period immediately preceding such hiring or engagement. (**Exhibits 4, 5, and 6, ¶ 2(b); emphasis in original**).

61.     The CGP Agreement also contains a "Confidentiality" provision, stating:

Employee hereby agrees that, during and after Employee's employment by [XPO] without limitation, he or she will hold in strict confidence any Confidential Information related to [XPO], and will not use any Confidential Information for any purpose whatsoever. (**Exhibits 4, 5, and 6,** ¶ 1).

62.     Culver, Greenhill, and Parke also agree that:

Employee acknowledges that it is impossible to measure in money the damages that will accrue [XPO] in the event that Employee breaches any of the provisions in Sections 1, 2, 3, 4, 5, 6 and 7 of this Agreement (the "Restrictive Covenants"). In the event that Employee breaches any such Restrictive Covenant, [XPO] shall be entitled to an injunction restraining Employee from violating such Restrictive Covenant (without posting any bond). (**Exhibits 4, 5, and 6,** ¶ 9).

## V.     The Good Agreement

63.     The Good Agreement contains numerous terms specifically intended to protect XPO's customer relationships and information, information technology, training programs, business plans, and other confidential or proprietary information to which Good was granted access in order to perform the responsibilities of his job.

64.     The Good Agreement includes a covenant in which Good agrees, for a period of six months following the end of his employment, among other things, not to become employed by, engage in business with, serve as an agent to, or perform services to an entity:

(i) that engages in or may engage in the Business, including, without limitation, any providers of third-party logistics services, including, without limitation, freight brokerage, freight forwarding, expediting, internet load boards or intermodal providers, or firms such as CH Robinson, Expeditors International of Washington, Inc., Echo Global Logistics Inc., Roadrunner Transportation Systems, TransCore, Internet Truckstop LLC and Hub Group Inc., (ii) that engages in or may engage in acquisition-related or mergers and acquisition activities related to the transportation or third-party logistics industry, including, without limitation, researching, analyzing and evaluating companies for possible investment in or acquisition of, for itself or clients, or (iii) that otherwise competes with [XPO] anywhere in which the [XPO] engages in or intends to engage in the Business or where [XPO's] customers are located. (**Exhibit 7**, ¶ 3(d)).

65. Furthermore, under the Good Agreement, for two years following the end of his employment with XPO, Good agrees not to:

(i) solicit for employment or hire or assist any other person or entity in soliciting for employment or hiring any employee of [XPO's], any independent contractor providing services to [XPO] or any employee of a company that has an "independent participant" relationship with [XPO] (collectively, "Restricted Persons") to perform services for any entity (other than [XPO]), (ii) attempt to induce any such Restricted Person to leave his or her employment or otherwise interfere with the existing relationship between [XPO] and the Restricted Persons, or (iii) solicit for employment, hire or engage on behalf of himself or any other person any person who was a Restricted Person at any time during the twelvemonth period immediately preceding such hiring or engagement. (**Exhibit 7**, ¶ 2; emphasis in original).

66. The Good Agreement also contains a "Confidentiality" provision, stating:

Employee hereby agrees that, during and after Employee's employment by [XPO] without limitation, he or she will hold in strict confidence any Confidential Information related to [XPO], and will not use any Confidential Information for any purpose whatsoever. (**Exhibit 7**, ¶ 1).

67. Good also agrees that:

Employee acknowledges that it is impossible to measure in money the damages that will accrue to the [XPO] in the event that Employee breaches any of the provisions in Sections 1, 2, 3, 4, 5, 6 and 7 of this Agreement (the "Restrictive Covenants"). In the event that Employee breaches any such Restrictive Covenant, [XPO] shall be entitled to an injunction restraining Employee from violating such Restrictive Covenant (without posting any bond). (**Exhibit 7**, ¶ 9).

## VI. The Individual Defendants Have Breached and Continue to Breach their XPO Employment Agreements

68. On January 7, 2016, XPO terminated the employment of Greenhill, Bilcox, Thomas, and Vestal after determining that those employees had engaged in improper workplace conduct.

69. Following his XPO employment, BDS hired Bilcox as its Managing Director of Strategic Accounts. On information and belief, in connection with BDS hiring Bilcox into that

role, both also intended that BDS would hire other former XPO employees to perform substantially the same jobs they performed for XPO.

70. On information and belief, Bilcox assisted BDS in poaching other XPO employees to reassemble at BDS some or all of the team that Bilcox worked with at XPO.

71. On March 11, 2016, Parke resigned from his position at XPO. Under Parke's Employment Agreement with XPO, he was prohibited from working for a XPO competitor until September 11, 2016. On information and belief, no later than July 8, 2016, Parke began employment at BDS. Parke began working at BDS fewer than six months after the end of his employment with XPO.

72. On September 12, 2016, Good resigned from his position at XPO. Under Good's Employment Agreement with XPO, he was prohibited from working for a XPO competitor until March 12, 2017. On information and belief, on September 17, 2016, five days after the end of his employment at XPO, Good began working for BDS.

73. On December 4, 2016, Culver resigned from her position at XPO, purportedly to retire. Under Culver's Employment Agreement with XPO, she was barred from working for a XPO competitor until May 4, 2017. On information and belief, on November 9, 2016, five days after her "retirement" from XPO, Culver began working for XPO's competitor, BDS.

74. In all, BDS and Bilcox have hired six former XPO employees in addition to Bilcox to staff the team that BDS and Bilcox have assembled to compete unfairly with XPO.

75. It has been far less than two years since any of the Individual Defendants ceased their employment for XPO. Therefore, at all relevant times, their covenants not to solicit XPO customers and/or employees have remained in force.

76. On information and belief, Bilcox and Good, and potentially other Individual Defendants, accessed and/or removed XPO's proprietary and confidential information from their XPO-owned computers shortly before the end of their employment with XPO.

77. On information and belief, one or more of the Individual Defendants have provided XPO's proprietary and confidential information to BDS.

78. BDS recently has begun using a carrier packet and agreement that is virtually identical to the one that XPO uses with its carrier contacts. On information and belief, one or more of the Individual Defendants disclosed XPO's carrier packet and agreement to BDS.

79. The Individual Defendants had access to a confidential and proprietary DAT Keypoint TMS data set during their employment at XPO. The DAT Keypoint TMS data set contained extensive information regarding historical, sales, and customer data from the Lake Forest location. On information and belief, BDS recently has begun using DAT Keypoint TMS software and one or more of the Individual Defendants disclosed to BDS XPO's confidential DAT Keypoint TMS data set.

80. On information and belief, the Individual Defendants have disclosed and intend to continue to disclose – and/or have used and intend to continue to use – their knowledge of XPO's confidential business information and strategies for the benefit of BDS.

81. In their employment with BDS, the Individual Defendants are in a position to provide BDS with an unfair and inappropriate competitive advantage over XPO by disclosing to BDS and/or using for BDS's benefit the confidential information the Individual Defendants acquired during their employment with XPO.

82.     BDS has raided XPO's Lake Forest workforce in order to compete unfairly with XPO without BDS expending the time, energy, and money that otherwise would be required to develop client relationships, carrier relationships, and advanced industry know-how.

## VIII.   BDS's Wrongful and Unlawful Conduct

83.     On information and belief, BDS recruited and hired the Individual Defendants with the intent to induce them to disclose to BDS their knowledge of XPO's confidential business information, in violation of the Employment Agreements that the Individual Defendants executed with XPO.

84.     On information and belief, BDS knew or should have known that the Individual Defendants – by disclosing XPO's confidential information – would breach their respective contractual obligations to XPO in their respective Employment Agreements.

85.     On information and belief, BDS intentionally and willfully induced the Individual Defendants to breach their obligations under their respective Employment Agreements with the purpose of injuring XPO's business.

86.     On Information and belief, BDS hired Bilcox with the purpose of having him solicit and hire other XPO employees, in violation of his and the Individual Defendant's respective Employment Agreements, and with the purpose of misappropriating business from XPO's Lake Forest location.

87.     On information and belief, BDS has sought to shortcut the years of hard work and investment borne by XPO by, among other things, gaining access to XPO's sensitive and confidential information from the Individual Defendants, in order to gain an unfair competitive advantage in the marketplace to the detriment of XPO.

88. On December 13, 2016, soon after learning that Bilcox, Good, and Parke were employed by BDS, a direct competitor, XPO sent a letter to BDS stating that it appeared BDS's employment of Bilcox, Good, and Parke breached those individuals' post-employment contractual obligations to XPO. XPO also cautioned BDS that XPO would vigorously enforce the terms of the Employment Agreements it had with all of its former employees and would take all steps necessary to prevent its former employees and any person or entity acting in concert with them from violating the Employment Agreements or other applicable law.

89. Also on December 13, 2016, XPO sent letters to Bilcox, Good, and Parke informing each of them that he had legal obligations under the Employment Agreement he had signed with XPO, that his employment with and/or activities on behalf of BDS likely violated the Employment Agreement, and that XPO would vigorously enforce the terms of the Employment Agreement.

90. Despite XPO's written demand that BDS and Bilcox, Good, and Parke abide by their respective contractual obligations under the Employment Agreements and provide assurances that they had done so, Defendants, on information and belief, have not taken any steps to ensure the covenants contained in the Employment Agreements are not breached and have not provided the necessary assurances.

91. In addition, the Individual Defendants, have engaged in business on behalf of BDS with customers and carriers with whom the Individual Defendants had contact with, and about whom they learned confidential and proprietary information, while the Individual Defendants were employed by XPO.

92. Given that BDS hired seven former XPO employees and has been allowing those employees to utilize on its behalf confidential and proprietary XPO information that they

possess, on information and belief, BDS has encouraged and acted in concert and cooperation with the Individual Defendants to engage in wrongful solicitation of XPO's customers, carriers, and employees, to engage in unfair competition against XPO, and to access and utilize improperly XPO's confidential and proprietary information.

93.     In this manner, BDS knowingly and intentionally induced the Individual Defendants to breach their respective covenants and obligations under the Employment Agreements.

94.     BDS intentionally and willfully induced the Individual Defendants to breach their Employment Agreements with the purpose of injuring XPO's business.

95.     BDS and the Individual Defendants continue to engage in activities that violate the Employment Agreements, tortiously interfere with XPO's contracts, cause the actual or threatened misappropriation of trade secrets, and unfairly compete with XPO.

96.     XPO will suffer irreparable harm unless this Court grants injunctive relief restraining Defendants from further breaches of XPO's rights under the Employment Agreements.

## COUNT I
### Breach of Agreement – Customer and/or Carrier Non-Solicitation Provisions
### (XPO Against Greenhill, Bilcox, Culver, Parke, Thomas, and Vestal)

97.     XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

98.     The Employment Agreements are valid and enforceable contracts between XPO and Greenhill, Bilcox, Culver, Parke, Thomas, and Vestal, respectively.

99.     XPO has performed all of its obligations to Greenhill, Bilcox, Culver, Parke, Thomas, and Vestal under their respective Employment Agreements.

100.    On information and belief, Greenhill, Bilcox, Culver, Parke, Thomas, and Vestal each has breached the customer and/or carrier non-solicitation provisions of his or her respective

Employment Agreement by (or by assisting another person or entity in) directly or indirectly contacting, soliciting, or disrupting XPO's customers and/or carriers and/or seeking to divert those customers' and/or carriers' business from XPO to BDS and/or by utilizing the confidential information in the possession of each former XPO employee.

101.    XPO has clearly ascertainable rights and protectable interests in its confidential information, its fair competitive position, its relationship with its customers and carriers, and its customer and carrier goodwill.

102.    The customer and/or carrier non-solicitation provisions are reasonably necessary and narrowly tailored to protect XPO's ascertainable rights and protectable interests.

103.    Further, the time limitation regarding the customer and/or carrier non-solicitation provisions is only two years, a reasonable period of time.

104.    Greenhill's, Bilcox's, Culver's, Parke's, Thomas's, and Vestal's breaches of the customer and/or carrier non-solicitation provisions contained in their respective Employment Agreements have caused and will in the future cause XPO to suffer irreparable harm, including lost business, lost goodwill, and strained customer and/or carrier relationships.

105.    Greenhill's, Bilcox's, Culver's, Parke's, Thomas's, and Vestal's continued and further breaches of the customer and/or carrier non-solicitation provisions contained in their respective Employment Agreements will cause, and have caused, XPO to suffer further lost business, lost goodwill, and erosion to customer and/or carrier relationships.

106.    XPO has no adequate remedy at law.

107.    Greenhill's, Bilcox's, Culver's, Parke's, Thomas's, and Vestal's respective Employment Agreements expressly provide that damages at law are an insufficient remedy for a breach of the customer and/or carrier non-solicitation provisions.

108.     The balance of hardships and the public's interest favor granting injunctive relief in favor of XPO and enjoining Greenhill, Bilcox, Culver, Parke, Thomas, and Vestal from any further breaches of their respective Employment Agreements.

109.     Further, as a consequence of Greenhill's, Bilcox's, Culver's, Parke's, Thomas's, and Vestal's breaches of the customer and/or carrier non-solicitation provisions of their respective Employment Agreements, XPO has suffered damages in an amount to be determined at trial.

**COUNT II**
**Breach of Agreement – Employee Non-Solicitation Provision**
**(XPO Against Individual Defendants)**

110.     XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

111.     The Employment Agreements are valid and enforceable contracts between XPO and the Individual Defendants.

112.     XPO has performed all of its obligations to the Individual Defendants under their respective Employment Agreements.

113.     On information and belief, the Individual Defendants have breached the employee non-solicitation provisions of their respective Employment Agreements by inducing or assisting BDS in soliciting or hiring XPO's employees.

114.     XPO has clearly ascertainable rights and protectable interests in its confidential information, employee data, and in maintaining a stable workforce.

115.     The employee non-solicitation provisions are reasonably necessary and narrowly tailored to protect XPO's ascertainable rights and protectable interests.

116.     Further, the time limitation regarding the employee non-solicitation provisions is only two years, a reasonable period of time.

117.    The Individual Defendants' breaches of the employee non-solicitation provisions contained in their respective Employment Agreements have caused and will in the future cause XPO to suffer irreparable harm, including lost business, lost goodwill, and strained customer relationships.

118.    The Individual Defendants' continued and further breaches of the employee non-solicitation provisions contained in their respective Employment Agreements will cause, and have caused, XPO to suffer further lost business, business costs related to a decline in the stability of its workforce, lost goodwill, and erosion to customer relationships.

119.    XPO has no adequate remedy at law.

120.    The Individual Defendants' respective Employment Agreements expressly provide that damages at law are an insufficient remedy for a breach of the employee non-solicitation provisions.

121.    The balance of hardships and the public's interest favor granting injunctive relief in favor of XPO and enjoining Individual Defendants from any further breaches of their respective Employment Agreements.

122.    Further, as a consequence of the Individual Defendants' breaches of the employee non-solicitation provisions of their respective Employment Agreements, XPO has suffered damages in an amount to be determined at trial.

**COUNT III**
**Breach of Contract - Confidentiality Provision**
**(XPO Against Individual Defendants)**

123.    XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

124.    The Employment Agreements are valid and enforceable contracts between XPO and the Individual Defendants.

125.    XPO has performed all of its obligations to the Individual Defendants under their respective Employment Agreements.

126.    On information and belief, the Individual Defendants have breached the confidentiality provisions of their respective Employment Agreements, by, *inter alia*, not keeping confidential and using and/or disclosing protected information belonging to XPO.

127.    XPO has clearly ascertainable rights and protectable interests in its confidential information and its fair competitive position.

128.    The confidentiality provisions contained in the Employment Agreements are reasonably necessary and narrowly tailored to protect XPO's ascertainable rights and protectable interests.

129.    The Individual Defendants' breaches of the confidentiality provisions contained in their respective Employment Agreements have caused and will in the future cause XPO to suffer irreparable harm, including lost business, lost customer and carrier goodwill, and strained customer and carrier relationships.

130.    The Individual Defendants' continued and further breaches of the confidentiality provisions contained in their respective Employment Agreements will cause XPO to suffer further lost business, lost customer and carrier goodwill, and erosion to customer and carrier relationships.

131.    XPO has no adequate remedy at law.

132.    The Employment Agreements expressly provide that damages at law are an insufficient remedy for the Individual Defendants' breaches of the confidentiality provisions contained in their respective Employment Agreements.

133.    The balance of hardships and the public's interest favor granting injunctive relief in favor of XPO and enjoining the Individual Defendants from any further breaches of the confidentiality provisions contained in their respective Employment Agreements.

134.    Further, as a consequence of the Individual Defendants' breaches of the confidentiality provisions contained in their respective Employment Agreements, XPO has suffered damages in an amount to be determined at trial.

### COUNT IV
### Breach of Agreement - Non-Competition Provision
### (XPO Against Culver, Good, and Parke)

135.    XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

136.    The Employment Agreements are valid and enforceable contracts between XPO and Culver, Good, and Parke, respectively.

137.    XPO has performed all of its obligations to Culver, Good, and Parke under their respective Employment Agreements.

138.    Culver, Good, and Parke have breached the non-competition provisions of their respective Employment Agreement, by, *inter alia*, accepting employment with BDS, a XPO competitor, less than six months after the end of their employment relationship with XPO.

139.    XPO has clearly ascertainable rights and protectable interests in its confidential information, its fair competitive position, its relationships with its customers, and its customer goodwill.

140.    The non-competition provisions in the Employment Agreements signed by Culver, Good, and Parke are reasonably necessary and narrowly tailored to protect XPO's ascertainable right and protectable interests.

141.    Further, the time limitation is only six months, a reasonable period of time.

142.    Further, the geographic restrictions of the non-competition provisions are reasonable.

143.    As a consequence of Culver's, Good's, and Parke's breaches of the non-competition provisions contained in their Employment Agreements, XPO has suffered damages in an amount to be determined at trial.

**COUNT V**
**Tortious Interference with the Employment Agreements**
**(XPO Against BDS)**

144.    XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

145.    The Employment Agreements are valid and enforceable contracts as between XPO and the Individual Defendants.

146.    XPO possesses valid and valuable contractual relationships with its employees, like the Individual Defendants, and XPO achieves economic gain as a result of its contractual relationships with its employees.

147.    On information and belief, BDS knew and was aware of the contractual relationship and obligations between XPO and the Individual Defendants.

148.    On information and belief, BDS has intentionally, willfully, and without justification induced or attempted to induce the Individual Defendants to breach their obligations under the Employment Agreements.

149.    As a result of BDS's wrongful acts, the Individual Defendants breached provisions of their Employment Agreements, resulting in (i) an unfair competitive advantage to a XPO competitor; and (ii) the use and/or disclosure of XPO's confidential information and the misuse of the goodwill that XPO has developed with its customers and carriers for the benefit of BDS and to the detriment of XPO.

150.    Unless enjoined, BDS will continue to induce the Individual Defendants to violate their respective Employment Agreements and facilitate their providing an improper competitive advantage to a XPO competitor.

151.    XPO has suffered, and will continue to suffer, irreparable harm as the result of BDS's interference with the Employment Agreements, and the resulting breach of the non-competition, customer non-solicitation, and employee non-solicitation provisions, and the use and disclosure of XPO's confidential information.

152.    XPO has no adequate remedy at law.  The injury to XPO's business is not easily quantified, and monetary damages cannot adequately compensate XPO for the competitive injury resulting from the breach of the Employment Agreements induced by BDS.

153.    The balance of hardships and the public's interest favor granting injunctive relief in favor of XPO and enjoining BDS from inducing any further breaches of the Employment Agreements and making use of or disclosing XPO confidential information.

154.    As a direct and proximate result of BDS's wrongful acts, XPO has suffered damages in an amount to be determined at trial.

### COUNT VI
### Tortious Interference With XPO's Business Relationships and/or Expectancy With its Customers
### (XPO Against BDS)

155.    XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

156.    At all relevant times, XPO has had business relationships with its customers.

157.    At all relevant times, XPO has reasonably expected that its business relationships with its customers would continue and XPO has invested time, effort, and money in developing and maintaining those business relationships.

158. BDS knew and was aware of the business relationships between XPO and its customers.

159. BDS intentionally, willfully, and without justification interfered with XPO's business relationships with its customers by soliciting, or otherwise conducting business with, XPO's customers and by inducing XPO's former employees to breach their post-employment contractual obligations to XPO, to solicit XPO's customers, and to disclose XPO's confidential information.

160. On information and belief, BDS's purposeful and improper interference has had the desired effect as several of the Individual Defendants have moved to BDS the business of XPO customers.

161. Unless enjoined, BDS will continue to induce the Individual Defendants to breach their respective Employment Agreements, to solicit XPO's customers, and to disclose XPO's confidential information, in order to solicit XPO's customers for the benefit of BDS.

162. XPO has suffered, and will continue to suffer, irreparable harm as the result of BDS's interference with its business relationships and/or expectancy with its customers.

163. XPO has no adequate remedy at law. The injury to XPO's business is not easily quantified, and monetary damages cannot adequately compensate XPO for the competitive injury resulting from BDS's intentional and improper interference with XPO's business relationships and/or expectancy with its customers.

164. The balance of hardships and the public's interest favor granting injunctive relief in favor of XPO and enjoining BDS from wrongfully and improperly interfering with XPO's business relationships and/or expectancy with its customers.

165.    As a direct and proximate result of BDS's past wrongful acts, XPO also has suffered damages in an amount to be determined at trial.

### COUNT VII
### Violation of Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836(b))
### (XPO Against BDS)

166.    XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

167.    XPO is the owner of valuable trade secrets use in, or intended for use in, interstate or foreign commerce.  Those trade secrets include, but are not limited to, detailed compilations of customer information, detailed compilations of carrier information, carrier pricing, history and performance information, sales records and documents, marketing and sales strategies, long-range plans, competitive strategies, and personnel related information.

168.    This information constitutes "trade secrets" under 18 U.S.C. § 1839(3) because (i) it is sufficiently secret to derive economic value from not being generally known to other persons who can obtain economic value from its disclosure or use; and (ii) XPO takes reasonable measures to safeguard the secrecy of the information.

169.    On information and belief, by accepting positions with BDS, one or more of the Individual Defendants have disclosed or will disclose, and/or have used or will use, XPO's trade secrets for the benefit of BDS.

170.    BDS knows or should know that the Individual Defendants acquired the trade secrets by improper means.

171.    XPO's trade secrets, as described in the preceding paragraphs, derive independent economic value from the fact that they are not generally known by, and are not readily ascertainable through proper means by, XPO's competitors.

172.    XPO's trade secrets represent the results of substantial efforts and investment by XPO.

173.    XPO also takes extraordinary measures to maintain the continued secrecy of its trade secret information, including, but not limited to, installing password protection of its electronically-stored information, limiting access to those who need such information, and requiring all visitors to sign in with building security.

174.    By using and/or threatening to use XPO's trade secrets in its business, BDS has misappropriated XPO's trade secrets as defined in 18 U.S.C. § 1839(5).

175.    BDS's misappropriation and/or threatened misappropriation of XPO's trade secrets are willful and malicious.

176.    Under 18 U.S.C. § 1836(b)(3), BDS's misappropriation and/or threatened misappropriation of trade secrets may be enjoined by this Court.

**COUNT VIII**
**Violation of Illinois Trade Secrets Act (765 Ill. Comp. Stat. 1065/2)**
**(XPO Against BDS)**

177.    XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

178.    In their positions with XPO, the Individual Defendants had access to and used XPO's trade secrets, including, but not limited to, detailed compilations of customer information, detailed compilations of carrier information, carrier pricing, history and performance information, sales records and documents, marketing and sales strategies, long-range plans, competitive strategies, and personnel related information.  This information constitutes "trade secrets" under 765 Ill. Comp. Stat. 1065/2(d) because (i) it is sufficiently secret to derive economic value from not being generally known to other persons who can obtain economic value from its disclosure or use; and (ii) XPO takes reasonable measures to safeguard the secrecy of the information.

179.    On information and belief, by accepting positions with BDS, one or more of the Individual Defendants have disclosed or will disclose, and/or have used or will use, XPO's trade secrets for the benefit of BDS.

180.    XPO's trade secrets, as described in the preceding paragraphs, derive independent economic value from the fact that they are not generally known by, and are not readily ascertainable through proper means by, XPO's competitors.

181.    XPO's trade secrets represent the results of substantial efforts and investment by XPO.

182.    XPO also takes extraordinary measures to maintain the continued secrecy of its trade secret information, including, but not limited to, installing password protection of its electronically-stored information, limiting access to those who need such information, and requiring all visitors to sign in with building security.

183.    By using and/or threatening to use XPO's trade secrets in its business, BDS has misappropriated and/or threatened misappropriation of XPO's trade secrets as defined in 765 Ill. Comp. Stat. 1065/2(b).

184.    BDS's misappropriation and/or threatened misappropriation of XPO's trade secrets are willful and malicious.

185.    XPO has been and will continue to be harmed by the misappropriation and/or threatened misappropriation of its trade secrets, and will be irreparably injured if BDS uses or discloses those trade secrets.

186.    Under 765 Ill. Comp. Stat. 1065/3, BDS's actual and threatened misappropriation of trade secrets may be enjoined by this Court.

## COUNT IX
## Unfair Competition
## (XPO Against BDS)

187.    XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

188.    Within the restricted time-period in the employee non-solicitation provisions of the Employment Agreements, BDS, with the assistance of the Individual Defendants after they had been enticed to join BDS, has systematically raided XPO's work force in order to (i) bolster and expand its own business performance, and (ii) obtain and exploit XPO's confidential, proprietary, trade secret, and highly sensitive business information.  This raiding has been at XPO's expense.

189.    BDS's misconduct constitutes a misappropriation of XPO's labors and expenditures and constitutes unfair competition and improperly undermines the stability of XPO's workforce.

190.    Unless enjoined, BDS will continue to raid XPO's work force in order to bolster and expand its business performance and to obtain and exploit XPO's confidential, proprietary, and highly sensitive business information, all at XPO's expense.

191.    XPO has suffered, and will continue to suffer, irreparable harm as the result of the aforementioned unfair competition.

192.    XPO has no adequate remedy at law.  The injury to XPO's business is not easily quantified, and monetary damages cannot adequately compensate XPO for the competitive injury resulting from BDS's unfair competition.

193.    The balance of hardships and the public's interest favor granting injunctive relief in favor of XPO and enjoining BDS from unfairly competing with XPO.

194.    As a direct and proximate result of BDS's wrongful acts, XPO has suffered damages in an amount to be determined at trial.

## COUNT X
### Civil Conspiracy
### (XPO Against All Defendants)

195.    XPO repeats and realleges Paragraphs 1-96 as if fully set forth herein.

196.    On information and belief, BDS and the Individual Defendants were aware of the Individual Defendants' contractual obligations under the Employment Agreements.

197.    On information and belief, BDS and the Individual Defendants knowingly and willingly conspired and agreed between themselves to breach the non-competition provisions, customer non-solicitation provisions, employee non-solicitation provisions, and/or confidentiality provisions contained in the Employment Agreements.

198.    The object BDS and the Individual Defendants sought to accomplish, and indeed what was accomplished, was to gain an improper competitive advantage, injure XPO's business, and strain XPO's customer and carrier relationships.

199.    BDS and the Individual Defendants committed and caused to be committed one or more overt and unlawful acts in furtherance of the conspiracy, including, but not limited to, the misappropriation of XPO's trade secrets.

200.    As a direct and proximate result of BDS's and the Individual Defendants' actions, XPO has suffered damages in an amount to be determined at trial.

**WHEREFORE**, XPO respectfully requests that this Court:

(a) Enjoin the Individual Defendants from soliciting its customers and/or carriers in violation of their respective Employment Agreements;

(b) Enjoin the Individual Defendants from soliciting XPO's employees in violation of the Individual Defendants' respective Employment Agreements;

(c) Enjoin the Individual Defendants from disclosing, misappropriating, or utilizing any and all of XPO's confidential information in violation of their respective Employment Agreements;

(d) Enjoin the Individual Defendants from working for BDS in violation of their respective Employment Agreements and/or applicable law;

(e) Enjoin BDS from encouraging or inducing the Individual Defendants to continue to breach their contractual obligations under the Individual Defendants' respective Employment Agreements;

(f) Enjoin BDS from disclosing, misappropriating, or utilizing any and all of XPO's confidential information in violation of the Defend Trade Secrets Act of 2016 and the Illinois Trade Secrets Act;

(g) Enjoin BDS from encouraging or inducing any current or former XPO employee to breach his or her post-employment contractual obligations to XPO;

(h) Enjoin BDS from directly or indirectly soliciting XPO's customers or carriers through any of the Individual Defendants or any other former XPO employee;

(i) Enjoin BDS from soliciting, recruiting, or hiring any of XPO's employees who have signed employment agreements containing non-compete provisions during the applicable restricted period;

(j) Award XPO all damages available, including but not limited to compensatory damages, punitive damages, unjust enrichment and restitution damages, disgorgement of profits, and exemplary damages;

(k) Award XPO all of its attorneys' fees incurred in connection with this action;

(l) Tax all costs against Defendants; and

(m) Grant XPO such additional and further relief as this Court deems necessary or appropriate.

Dated: March 13, 2017                    Respectfully submitted,

                                         By:  _s/ Charles B. Leuin_____
                                         Charles B. Leuin
                                         Jonathan H. Claydon
                                         Elan Shpigel
                                         Greenberg Traurig, LLP
                                         77 West Wacker Drive, Suite 3100
                                         Chicago, Illinois 60601
                                         Tel: (312) 456-8400
                                         Fax: (312) 456-8435

                                         *Attorneys for Plaintiff*